Thomas A. WILKINSON, III, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C–C–89–307–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

July 30, 1991.

Cecil M. Curtis, Charlotte, N.C., for plaintiff.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., Jon D. Pifer, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM OF DECISION

ROBERT D. POTTER, District Judge.

THIS MATTER came on for hearing before the undersigned on May 20, 1991 at

Charlotte, North Carolina. Cecil M. Curtis, Esquire, represented the Plaintiff and Jon D. Pifer, Trial Attorney, Tax Division, U.S. Department of Justice, represented the Defendant.

## FINDINGS OF FACT

1. Thomas A. Wilkinson, Jr., [hereinafter "taxpayer"], father of the Plaintiff in this action, operated a business identified as Realty Maintenance Services, Inc., a North Carolina Corporation, [hereinafter "RMS"] which during the years 1984 through 1986 experienced financial difficulties. The taxpayer was Vice President of RMS during those years and ran its day-to-day affairs. Defendant's Exhibit [hereinafter "DX" or "GX"] 9 was executed by the taxpayer indicating he was also a Director of RMS. (Stipulation of Fact [hereinafter "SF"] No. 4).

2. During the years 1984 through 1986, RMS withheld taxes from the wages of its employees, but failed to remit the withheld taxes to the Defendant. [GX 7, 10].

3. The Property at 1215 Carey Court [hereinafter "the Carey Court Property"] was held by the taxpayer and his wife Ermine W. Wilkinson [hereinafter "Ermine"] as tenants by the entireties prior to June 29, 1987. [SF 8]. On June 29, 1987, the taxpayer, together with his wife Ermine, by her attorney-in-fact, the Plaintiff in this action, executed a deed from she and the taxpayer to convey the property to Ermine individually, which was presented to the Register of Deeds for Mecklenburg County on June 30, 1987, and recorded in Book 5538 at Page 152 in that office. [GX 1; SF Nos. 8 and 9]. The house was worth approximately $57,000 on that date (Transcript of Trial Testimony [hereinafter "Tr."] 39). The Plaintiff knew his father, the taxpayer, did not have any assets except the Carey Court Property on June 29, 1987 [Tr. 48–49].

4. Ermine died July 1, 1987, leaving a Will dated March 12, 1987 devising and bequeathing all of her property, which included the Carey Court Property, to Thomas Albert Wilkinson, III, the Plaintiff in this action. On July 13, 1987, Plaintiff was appointed Executor of her Will. [SF Nos. 10 and 11; GX Nos. 2 and 4].

5. The taxpayer attempted to commit suicide in September of 1986. He survived the attempt, but was left severely brain damaged. The taxpayer was adjudged incompetent on June 23, 1987. (Plaintiff's Exhibit, [hereinafter "PX"] 1; SF 6, 7).

6. On October 27, 1987, Edward G. Connette qualified as legal Guardian for the taxpayer, and the taxpayer, through his Guardian, dissented from the Will of Ermine and brought suit in state court against Thomas A. Wilkinson, III, the Plaintiff in this action, as sole beneficiary of Ermine's Will and as executor of her Will. The action sought to set aside the June 29, 1987 deed on the grounds that the taxpayer had been declared legally incompetent on June 23, 1987, six days prior to executing the deed to Ermine. [SF Nos. 6, 7, and 12].

7. The Plaintiff in this action counterclaimed and alleged that the taxpayer had forged the name of the Testatrix on a Deed of Trust for the Carey Court Property, pledged stocks belonging to her as collateral for a loan, and that the conveyance of the Carey Court Property to her on June 29, 1987 was to fulfill a promise by the taxpayer to convey his interest in the Carey Court Property to her as compensation for the alleged damage to her. [Deposition GX 6; SF 13].

8. On December 10, 1987, the taxpayer was notified by the IRS that it proposed to assess a penalty against him for the total amount of employment tax withheld from the employees of RMS for the years 1984 through 1986 and not paid to the Government. [GX 2].

9. On April 19, 1988, there was a Settlement Agreement entered into between the estate of Ermine W. Wilkinson and the Guardian for the taxpayer. [GX 3]. Cecil M. Curtis, Attorney for the Estate of Ermine W. Wilkinson, executed the Agreement on behalf of her estate. Cecil Curtis had also prepared the purported deed recorded on June 30, 1987 in Book 5538 at

Page 152, Mecklenburg County Public Registry. [GX 1 and 3].

10. Thereafter, on July 11, 1988, the IRS assessed a penalty, under Section 6672 of the Internal Revenue Code, against the taxpayer. The penalty was assessed for the "trust fund portion" of the delinquent 1984 through 1986 employment tax liabilities of RMS in the total amount of $28,920.30, plus interest. On November 28, 1988, the IRS filed a Notice of Federal Tax Lien on the Carey Court Property, naming the Plaintiff as "nominee, alter-ego, or agent" of the taxpayer. [GX 7; SF Nos. 15 and 16].

11. Pursuant to the Settlement Agreement dated April 19, 1988, the taxpayer's Guardian executed a quit claim deed dated April 19, 1988 and filed in the Office of the Register of Deeds on the same date wherein the Guardian conveyed all the interests of his ward in the Carey Court Property to the Plaintiff. [PX 1, Settlement Agreement Exhibit F].

12. On April 19, 1988, the Guardian was not aware of the outstanding liabilities of RMS or of the taxpayer's own tax liability as a Director and Officer of RMS. [SF No. 17].

13. The Plaintiff contends that he owns the Carey Court Property free and clear of the federal tax lien because he became the owner of the Carey Court Property before the tax lien arose and before the tax lien was perfected by filing. The United States claims that the conveyance through which the Plaintiff claims ownership was a fraudulent conveyance and void as to the United States, and that any interest in the Carey Court Property is subject to the tax liability of the taxpayer, Plaintiff's father.

14. The Carey Court Property was essentially the taxpayer's only asset. He had no income other than Social Security at the time of the quit claim deed, and he had no other assets. [Tr. 48].

15. Further, when the Plaintiff executed the June 29, 1987 deed, [GX 1], as attorney-in-fact for his mother, together with his incompetent father, purporting to convey the Carey Court Property to Plain-

tiff's mother, the Plaintiff's father was insolvent. [Tr. 39].

16. During the years 1984 through 1986 the taxpayer tried to borrow money from Plaintiff from time to time and the taxpayer "owed everyone in the world." [Tr. 25–26].

17. The Plaintiff holds an MBA from Cornell University [Tr. 18] and in 1984–1986 he knew that when employees' withholding taxes were not paid by the employer, that the officers of the employer company were personally liable. [Tr. 21–22].

18. The Plaintiff was aware of the tax debts owed by RMS in at least July of 1986 when he discussed the matter with IRS Agent Hamilton. [Tr. 86, 87].

19. In October of 1986, Plaintiff was aware that the taxpayer owed the IRS $15,000–$20,000, and that it was for withholding taxes, [Tr. 30], and that RMS did not have enough money in its account to pay the tax. [Tr. 31].

20. The Plaintiff requested of Agent Hamilton that the IRS liquidate the assets of RMS, [Tr. 88], which the IRS did, the sale yielding $1,833. Agent Hamilton informed Plaintiff by telephone in January of 1987 that a 100% penalty assessment would be made against the officers of RMS, including the taxpayer for the shortfall. [Tr. 88–89].

21. The Plaintiff testified that his father, the taxpayer, had signed the deed dated June 29, 1987 [GX 1], conveying his interest in the Carey Court Property to Plaintiff's mother, Ermine, after he had been declared incompetent, but that he had "all along" indicated he wished to sign it. [Tr. 41]. The Court has observed the Plaintiff in his testimony, and based upon observation of his demeanor while testifying, his evasive answers, and the circumstances under which the deed was signed, the Court does not find the Plaintiff's testimony to be credible. The Plaintiff had signed the deed two days before his mother's death, as her attorney-in-fact, in an attempt to vest in his mother all interest in the Carey Court Property. The Plaintiff was the sole beneficiary of his mother's will, of which fact the Plaintiff was aware. [Tr. 44].

22. Even though it has been stipulated that the Guardian was not aware of any tax liability by the taxpayer, he was aware that at the time of settlement that there were two lawsuits pending against the taxpayer and another one threatened. The Guardian testified that the existence of other creditors had an impact on his decision to settle the claims in his lawsuit against the Plaintiff in this action, and that the existence of other creditors was material to his decision to settle. [Tr. 71].

23. According to the Guardian it was relevant to his decision in a number of ways. The Guardian testified that through meetings with the creditors an unsuccessful attempt had been made to resolve all the claims on a pro-rata basis. He further testified that his primary concern was the ward, his personal security, food, housing, and health care. He testified that "... we felt that if we had actually recovered money in a lump sum, that that money could have been subject to execution by the creditors that we knew of had they prevailed in any civil actions so that the money would not have been available to—for the future welfare of our client." [Tr. 71–72]. Clearly, the conveyance of the Carey Court Property to Plaintiff was an attempt to hinder creditors, and the Court so finds.

24. The Guardian further testified that he had not known about the IRS claim, that the taxpayer was not able to help him because of his infirmity, and that neither the Plaintiff in this action nor anyone for him had told the Guardian about the tax liability on July 24, 1988, a few months after the settlement agreement. [Tr. 73].

25. Thus, the Plaintiff, in an attempt to have the Carey Court Property conveyed to him free of any tax liens had not told the Guardian about the tax liability which he had been aware of since at least 1986. [Tr. 30]. The Plaintiff was also aware of the taxpayer's personal liability for those taxes. [Tr. 21–22].

26. The Carey Court Property is valued at approximately $57,000 subject to a $5,000.00 mortgage. As of the date of trial, the Plaintiff had paid approximately

$16,400.00 to the Guardian on behalf of his father. [Tr. 81].

27. The Plaintiff's mother's estate, of which the Plaintiff was the sole beneficiary, was worth approximately $120,-000.00, and would net out to at least $100,-000.00 after debts. [Tr. 81, 82].

28. The taxpayer's dissent to Ermine's Will would have been worth about $30,-000.00 to $55,000.00. [N.C.Gen.Stat. §§ 30–1; 29–14(b)(2) and Tr. 82]. The settlement agreement [GX 3] provided in essence:

(a) The Guardian would dismiss the civil action against the Plaintiff in this action to void the deed conveying the Carey Court Property to Ermine. The Plaintiff in this action is the sole beneficiary of her Estate.

(b) The estate of Thomas A. Wilkinson, Jr. (the taxpayer and husband of Ermine) would withdraw his dissent from Ermine's Will. [GX 3].

(c) The Estate of Ermine shall pay $10,-000.00 to the General Guardian for Thomas A. Wilkinson, Jr., the taxpayer, to pay for costs of Administration and legal expenses, with any surplus to be refunded to the Plaintiff in this action.

(d) The Plaintiff in this action shall provide a condominium in Richmond for Thomas A. Wilkinson, Jr., Plaintiff's father, plus living expense.

(e) The Estate of Ermine will dismiss its counterclaims against the taxpayer in the amount of approximately $20,000.00. [Tr. 82].

(f) The General Guardian of the Estate of the taxpayer will execute a quit claim deed to Thomas A. Wilkinson, III, the Plaintiff in this action.

(g) The Settlement Agreement further recited that Ermine's estate had prevailed in two legal actions to recover securities allegedly used by the taxpayer as collateral for a loan to him and his company. The Estate had also prevailed in a suit to cancel a note and deed of trust on which the taxpayer had allegedly fraudulently signed Ermine's name, and that Ermine had incurred "significant legal fees in that action."

29. The taxpayer in 1988 received approximately $810.00 a month social security and his living expenses were approximately $900.00 a month. [Tr. 68–69].

30. So, in the Settlement Agreement the Plaintiff relinquished unproved counterclaims of $20,000.00, agreed to support the taxpayer at cost of approximately $100.00 a month, paid $10,000.00 to the Guardian from Ermine's estate, and agreed to provide (not convey) a condominium for the taxpayer in Richmond. The Plaintiff has paid $16,400.00 to the Guardian for his father's (the taxpayer) expenses. [Tr. 78].

31. The Plaintiff received the Carey Court Property valued at approximately $57,000.00, less a $5,000.00 mortgage and his mother's estate of approximately $100,-000–$125,000.00 free of a dissent claim of a value of $30,000 to $55,000.00.

32. The Plaintiff has provided support for his father because of the Settlement Agreement and because of his moral obligations to the taxpayer, Plaintiff's father. [Tr. 48, 51–52].

33. There is no evidence that the Plaintiff would convey a condominium in Richmond to his father only that he "provide a condominium unit for or apartment for his father." [GX 3, pp. 3 and 4].

34. In any event, the taxpayer, Plaintiff's father, was as of the date of trial living in the Carey Court Property which has been conveyed to the Plaintiff. [Tr. 53].

35. Based on all of the above, the Court finds that there was grossly insufficient consideration for the conveyance by the Guardian of the Carey Court Property to the Plaintiff.

36. This Court has previously considered a motion for summary judgment by the Defendant which was denied, the Court holding that: "In summary, the Court believes that a material issue of fact exists regarding whether the transfer was fraudulent." *Wilkinson v. U.S.*, 741 F.Supp. 577 (W.D.N.C.1990).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the action instituted by the Plaintiff pursuant to 28 U.S.C. § 1346.

2. A suit under 28 U.S.C. § 2410 is proper only to contest the procedural regularity of a lien; it may not be used to challenge the underlying tax liability or the validity of the tax assessment. *Pollack v. United States*, 819 F.2d 144, 145 (6th Cir. 1987); *Aqua Bar & Lounge, Inc. v. United States*, 539 F.2d 935, 939 (3rd Cir.1976); *Broadwell v. United States*, 343 F.2d 470, 471 (4th Cir.1965); *cert. denied*, 382 U.S. 825, 86 S.Ct. 57, 15 L.Ed.2d 70 (1965); *see also Batts v. United States*, 228 F.Supp. 272, 275 (E.D.N.C.1964).

3. The law requires an employer-corporation to deduct and withhold from the wages of employees, Federal Insurance Contributions Act (FICA) taxes and federal income tax. 26 U.S.C. §§ 3102(a), 3402(a), 3403. The employer is also required to file periodic federal tax deposits with commercial banks designated as depositories by regulation. Treas.Reg. § 31.6302(c)–1. The amount of the tax actually withheld by employers from employees is held to be "a special fund in trust for the United States." 26 U.S.C. § 7501(a). In the event that the employer fails to pay over these trust fund amounts, and has no assets from which such liabilities can be satisfied, employees are nevertheless entitled to credit for the amount of income and FICA taxes withheld. See e.g., *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). Section 6672 of the IRC imposes a penalty, equal to the "the tax evaded, or not collected, or not accounted for and paid over" on any person who (1) was required "to collect, truthfully account for and pay over" employment taxes and (2) willfully failed to do so. 26 U.S.C. § 6672. In this case, the United States has assessed such a penalty against the taxpayer for the trust fund portion of the unpaid employment taxes of the taxpayer's company, RMS.

4. A federal tax lien arises upon assessment and attaches to all property and rights to property belonging to a tax-

payer. 26 U.S.C. §§ 6321 and 6322. Here, the federal tax lien arose on July 11, 1988 when the assessment was made against the taxpayer for a penalty pursuant to § 6672 of the IRC. The filing of the Notices of Federal Tax Lien on November 28, 1988 perfected this lien interest against certain creditors of the taxpayer. 26 U.S.C. § 6323. The issue herein is whether the taxpayer had an interest in the subject real property to which the tax lien could attach. The determination of the nature of a property interest, and whether the taxpayer has property to which a tax lien may attach, is made according to state law. *Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); *United States v. Bess* 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958). "Regardless of when federal taxes are actually assessed, taxes are considered as due and owing, and constitute a liability, as of the date the tax return for the particular period is required to be filed." (Citations omitted) *United States v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla. 1977), *aff'd* 576 F.2d 650 (5th Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979).

■■■ 5. The United States may rely on applicable state fraudulent conveyance law if a taxpayer disposes of property prior to the existence of federal tax liens. *Commissioner v. Stern*, 357 U.S. 39, 45, 78 S.Ct. 1047, 1051, 2 L.Ed.2d 1126 (1958); *United States v. Kaplan*, 277 F.2d 405 (5th Cir.1960); *United States v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla.1977). A Notice of Federal Tax Lien, filed against one party as nominee or alter-ego of another, is a valid method for the United States to perfect a lien on property which has been conveyed in order to avoid creditors. *Stophel v. United States*, 81-2 U.S.T.C. ¶ 9669 (E.D.Tenn.1981); *Baldasari v. United States*, 79 Cal.App.3d 267, 144 Cal.Rptr. 741 (1978).

6. Under North Carolina law, a conveyance in fraud of creditors is void as to creditors. N.C.Gen.Stat. § 39–15. In the cornerstone case of *Aman v. Walker*, 165 N.C. 224, 81 S.E. 162 (1914), the North Carolina Supreme Court set out five circumstances where conveyances are fraudulent and void as to creditors under the North Carolina fraudulent conveyance statute. The facts of this case are square within the second of those circumstances. The second circumstance in *Aman* is:

> ... If [a] conveyance is voluntary, and the grantor did not retain property fully sufficient and available to pay his debts then existing, it is invalid as to creditors; but it cannot be impeached by subsequent creditors without proof of the existence of a debt at the time of its execution, which is unpaid, and when this is established and the conveyance avoided, subsequent creditors are let in and the property subjected to the payment of creditors generally.

*Aman v. Walker*, 165 N.C. at 227, 81 S.E. 162.

7. Section 39–17 of the General Statutes of North Carolina provides as follows:

**§ 39–17. Voluntary conveyance evidence of fraud as to existing creditors.**

No voluntary gift or settlement of property by one indebted shall be deemed or taken to be void in law, as to creditors of the donor or settle prior to such gift or settlement, by reason merely of such indebtedness, *if property, at the time of making such gift or settlement, fully sufficient and available for the satisfaction of his then creditors, be retained by such donor or settler; but the indebtedness of the donor or settler at such time shall be held and taken, as well with respect to creditors prior as creditors subsequent to such gift or settlement, to be evidence only from which an intent to delay, hinder or defraud creditors may be inferred; and in any trial shall, as such, be submitted by the court to the jury, with such observations as may be right and proper.*

N.C.Gen.Stat. § 39–17 (1990) (emphasis added). "A conveyance is voluntary when it is not for value, *i.e.*, when the purchaser does not pay a reasonably fair price such as would indicate unfair dealing and be suggestive of fraud." *Nytco Leasing, Inc. v. Southeastern Motels, Inc.*, 40 N.C.App. 120, 128, 252 S.E.2d 826 (1979).

8. The Plaintiff does not contend that the taxpayer validly conveyed his interest in the subject real property to Ermine Wilkinson through the June 29, 1987 deed. That instrument was ineffective to convey any title to Ermine because the taxpayer was legally incompetent at the time that he signed it. That husband and wife constitute a legal entity separate and distinct from the component parts of the marital status was recognized as early as the Fourteenth Century. It was so declared by the North Carolina Supreme Court as early as 1837 in *Motley v. Whitemore*, 19 N.C. 537 (1837). See also *Woolard v. Smith*, 244 N.C. 489, 492, 94 S.E.2d 466 (1956). Death creates no new estate in the survivor. The survivor takes by reason of the original conveyance. *Underwood v. Ward*, 239 N.C. 513, 80 S.E.2d 267 (1954); *Spruill v. Branning Mfg. Co.*, 130 N.C. 42, 40 S.E. 824 (1902). Therefore, since the taxpayer and Ermine were tenants by the entireties of the Carey Court Property on July 1, 1987, the taxpayer as survivor of Ermine became the sole owner by survivorship on that date when Ermine died.

9. The validity of the transfer in question does not turn in any way on the validity of the judgment of the North Carolina state court in approving the Settlement Agreement of the lawsuit between the taxpayer and the Plaintiff. That court neither adjudicated the issues present in this case nor the rights of the United States, which was not a party to this action.

10. The Plaintiff has proposed that the issue is: Did the taxpayer, Thomas A. Wilkinson, Jr., have an interest in the real property on November 29, 1988 sufficient to enable the Government to attach said property by way of the tax lien filed?

11. The Court disagrees as to the date. As stated above, the law is that a federal tax lien arises upon assessment and attaches to all property and rights to property belonging to a taxpayer.

12. Assessment was made against the taxpayer on July 11, 1988. Therefore, the crucial question is whether the taxpayer owned the Carey Court Property on that date. Since he had been declared incompe-

tent and his Guardian had conveyed the property to the taxpayer's son, the Plaintiff in this action, on April 19, 1988 the answer to the question whether the taxpayer owned the Carey Court Property on July 11, 1988 turns on whether the Guardian's conveyance to the son is void as a fraudulent conveyance or a conveyance to hinder creditors and thus the Property is subject to the tax lien of the United States.

13. The first question to decide is did the Plaintiff purchaser pay a reasonably fair price for the Carey Court Property, such as would indicate fair dealing?

14. The Court has made findings of fact that indicate the consideration paid by the Plaintiff for the Property was grossly inadequate. (See Findings of Fact [hereinafter "FF"] 28, 29, 30, 31, 32, and 33).

15. The next question is whether the Guardian retained sufficient property for the satisfaction of creditors.

16. It has been stipulated that the Guardian was not aware of the tax liability of the taxpayer. However, the taxpayer was insolvent on April 19, 1988, the date of the quit claim deed from the Guardian to the Plaintiff, as well as on June 29, 1987 when the Plaintiff, as attorney-in-fact for his mother, signed together with the taxpayer a deed attempting to convey the Carey Court Property to Ermine, Plaintiff's mother. [FF 14, 15]. The taxpayer had tried to borrow money from Plaintiff from 1984–1986, and he "owed everyone in the world." [FF 16]. The Guardian knew that there were creditors of the taxpayer and the existence of creditors was material to his decision to settle the lawsuit with the Plaintiff and the conveyance of the Carey Court Property to the Plaintiff was a part of that Settlement Agreement. [FF 22, 23, 24, 25].

17. The Plaintiff knew that unpaid employees' withholding taxes were the personal liability of the company officers, of whom his father was one, and the Plaintiff was aware of the tax liability here as early as 1986. [FF 17 and 18]. The Plaintiff knew in October of 1986 of the $15–$20,000

tax liability and that RMS did not have enough money to pay the tax. [FF 19].

18. The Plaintiff was informed by IRS Agent Hamilton in January of 1987 that a 100% penalty would be assessed against the officers of RMS including the taxpayer. [FF 20]. The Guardian was aware there were lawsuits pending against the taxpayer and another one threatened and that those facts had an impact on his decision and the existence of creditors was material to his decision to settle, which included conveyance of the Carey Court Property. [FF 22].

19. The Guardian had not known about the tax liability and neither the Plaintiff nor anyone else had informed him. He found out about it on July 24, 1988. [FF 24].

20. The taxpayer is still living at Carey Court. Clearly, with the conveyance of the Carey Court Property the Guardian intended to delay and hinder creditors. [FF 23]. The taxpayer being indebted to the state of clear insolvency, the Guardian's act of conveying the Carey Court Property hindered the creditors and was void in law, whether done with an intent actually fraudulent or not.

> It is a principle of the common law as old as the law itself, and upon which the preservation of all property depends, that, except so far as the same may be exempt by positive law, the whole of every man's property shall be devoted to the payment of his debts. He cannot gratuitously give away any part of it, the law meaning that he shall be just to his creditors before he is generous to his family. From the fact that he was at the time insolvent, and that his transfer to his daughters was without valuable consideration, it results, as a conclusion of law, that the assignment was void as to his creditors. As said in *Gentry v. Harper*, 55 N.C. 177, it is against conscience for debtors to attempt in any way to withdraw property or effects from the payment of debts; and if the courts of law cannot reach the debtor's interest, a court of equity will.

> ... It is not necessary to show an actual intent to defraud. The transaction is void per se. Revisal, see 962; citing cases.

*Michael v. Moore*, 157 N.C. 462, 463–464, 73 S.E. 104 (1911).

21. The Court finds that the Plaintiff did not pay a reasonably fair price for the Carey Court Property and therefore there is a voluntary conveyance of the Carey Court Property to Plaintiff by the Guardian.

22. Insufficient property was retained by the Guardian to pay the taxpayer's debts including his tax liability.

23. The purpose of the conveyance of the Carey Court Property was to hinder the taxpayer's creditors, including the United States.

24. Finally, the Court wants it clearly understood that the Court does not mean to imply in any way that the Guardian acted with any intent to defraud.

## CONCLUSION

The Court concludes that the conveyance of the Carey Court Property by the Guardian of the taxpayer to the taxpayer's son, the Plaintiff in this action, is void in law as to the United States and is subject to the lien for the tax liability of the taxpayer, Plaintiff's father.

Findings of Fact which may be deemed Conclusions of Law are so seemed and Conclusions of Law that may be deemed Findings of Fact are so deemed.

A Judgment will be filed simultaneously with this Memorandum of Decision.